**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 18, 2013**
_____

**Nos. 12-5300 & 12-5312**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

WILDEARTH GUARDIANS, *et al.*,

*Plaintiff-Appellants*,

v.

SALLY JEWELL, SECRETARY OF THE INTERIOR, *et al.*,

*Defendant-Appellees*,

and

ANTELOPE COAL LLC, STATE OF WYOMING, AND THE NATIONAL
MINING ASSOCIATION,

*Defendant-Intervenor-Appellees*.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

**RESPONSE BRIEF OF DEFENDANT-INTERVENOR-APPELLEES
[FINAL]**
_____

*Counsel Listed on Inside Cover*

Andrew C. Emrich
Holland & Hart LLP
6380 S. Fiddlers Green Circle, Suite 500
Greenwood Village, CO 80111
(303) 290-1621


John A. Bryson
Holland & Hart LLP
975 F Street, N.W., Suite 900
Washington, DC 20004
(202) 654-6920

James Kaste
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, WY 82002
(307) 777-6946


Creighton R. Magid
Dorsey & Whitney LLP
1801 K Street, N.W., Suite 750
Washington, D.C. 20006
(202) 442-3000

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Defendant-Intervenor Appellees state as follows:

**A.      Parties, Intervenors, and Amici**

All parties are identified in Appellants' Brief.

**B.      Rulings under Review**

References to the rulings at issue in this Court accurately appear in the Appellants' Brief.

**C.      Related Cases**

These cases have not been previously before this Court or any other court. *WildEarth Guardians et al. v. BLM et al.*, Civ. No. 1:11-cv-01481-RJL, currently pending in the United States District Court for the District of Columbia, was brought by some of the appellants in these cases, WildEarth Guardians, Defenders of Wildlife, and Sierra Club.  That case challenges another coal lease sale in the Powder River Basin.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P., and Circuit Rule 26.1, Defendant-Intervenor-Appellees make the following disclosures:

### Antelope Coal LLC

1.  Antelope Coal LLC, is a non-publicly traded Delaware limited liability company formed for the purpose of operating the Antelope coal mine in Campbell and Converse Counties, Wyoming.  Antelope Coal LLC is owned by NERCO Coal LLC.

2.  NERCO Coal LLC is a non-publicly traded Delaware limited liability company which is owned by the following entities:

    a.  Cloud Peak Energy Resources LLC, a non-publicly traded Delaware limited liability company, and

    b.  Cloud Peak Energy Services Company, a non-publicly traded Delaware corporation.

3.  Cloud Peak Energy Services Company is owned by Cloud Peak Energy Resources LLC, a non-publicly traded Delaware limited liability company.

4.  Cloud Peak Energy Resources LLC is owned by Cloud Peak Energy Inc. Cloud Peak Energy Inc. is a Delaware corporation that is traded on the New York Stock Exchange under the symbol CLD.  According to its February 12, 2013 Schedule 13G/A filing with the Securities and Exchange Commission,

iv

T. Rowe Price Associates, Inc. represented that it owns 10% or more of Cloud Peak Energy Inc.'s common stock.

**The National Mining Association**

The National Mining Association (NMA) is a trade association that is composed of companies in the mining sector.  The NMA is not a public company and no entity owns stock in NMA.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

CORPORATE DISCLOSURE STATEMENT ....................................................... iv

TABLE OF AUTHORITIES ................................................................................ vii

GLOSSARY ......................................................................................................... xii

JURISDICTIONAL STATEMENT ......................................................................1

STATUTES AND REGULATIONS .....................................................................1

ISSUES PRESENTED..........................................................................................1

STATEMENT OF FACTS ...................................................................................1

STANDARD OF REVIEW ..................................................................................2

SUMMARY OF ARGUMENT ............................................................................2

ARGUMENT .......................................................................................................3

    I.      Appellants Have Waived Any Argument That They Have Standing
           to Challenge BLM's NEPA Analysis of Climate Change Effects............3

    II.     If the Court Considers the District Court's Standing Ruling,
           Appellants Do Not Have Standing to Assert Climate Claims as a
           Result of Their Non-Climate Harms ......................................................6

    III.    If the Court Considers the Issue, the District Court Correctly
           Determined that Appellants' Proffered Facts Do Not Establish that
           They Have Standing to Raise Their Climate Change Claims .................14

    IV.    Even If Appellants Have Standing to Challenge BLM's NEPA
           Analysis of Climate Change Effects, BLM Complied Fully with
           NEPA.....................................................................................................16

    V.     BLM's Analysis of Ozone Impacts Complies with NEPA .....................22

    VI.    BLM's Analysis of Reclamation Impacts Complied with NEPA...........25

    VII.   There is No Merit to the Claim that BLM Failed to Ensure
           Compliance with the Acreage Limitations of the Mineral Leasing
           Act ........................................................................................................33

    VIII.  BLM Fully Complied with FLPMA.......................................................35

CONCLUSION ...................................................................................................38

# TABLE OF AUTHORITIES[1]

## CASES

*Albuquerque Indian Rights v. Lujan*,
    930 F.2d 49 (D.C. Cir. 1991) ............................................................................ 16

*\*Allen v. Wright*,
    468 U.S. 737 (1984) ........................................................................................ 8

*American Electric Power Co. v. Connecticut*,
    131 S.Ct. 2527 (2011) ............................................................................... 12, 15

*American Wildlands v. Kempthorne*,
    530 F.3d 991 (D.C. Cir. 2008) ........................................................................ 6

*Amigos Bravos v. BLM*,
    816 F. Supp. 2d 1118 (D.N.M. 2011) ............................................................ 12

*\*Barnes v. U.S. Dep't of Transp.*,
    655 F.3d 1124 (9th Cir. 2011) ........................................................................ 19

*Center for Biological Diversity v. NHTSA*,
    538 F.3d 1172 (9th Cir. 2008) ............................................................ 15, 20, 21

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ................................................................. 21, 32

*\*Clapper v. Amnesty Int'l USA*,
    133 S.Ct. 1138 (2013) ...................................................................................... 9

*Coalition for Responsible Regulation, Inc. v. EPA*,
    684 F.3d 102 (D.C. Cir. 2012) ................................................................. 11, 15

*Coalition for Sensible Transp. v. Dole*,
    826 F.2d 60 (D.C. Cir. 1987) ........................................................................ 24

*Conserv. NW v. Rey*,
    674 F. Supp. 2d 1232 (W.D. Wash. 2009) .................................................... 19

---

[1] Authorities upon which we chiefly rely are marked with an asterisk.

*Ctr. for Biological Diversity v. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009)..............................................................12, 13, 15

*Ctr. for Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005)...........................................................................8

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)..............................................................................7, 8, 9, 10

*Dep't of Transp. v. Public Citizen*,
  541 U.S. 752 (2004)...............................................................................18, 22, 31

*District of Columbia v. Air Florida, Inc.*,
  750 F.2d 1077 (D.C. Cir. 1984)..........................................................................4

*Earle v. District of Columbia*,
  707 F.3d 299 (D.C. Cir. 2012)............................................................................4

*Flynn v. Comm. of Internal Rev. Serv.*,
  269 F.3d 1064 (D.C. Cir. 2001).........................................................................5

*Friends of Blackwater v. Salazar*,
  691 F.3d 428 (D.C. Cir. 2012)...................................................................16, 17

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)..............................................................................................3

*Jankovic v. Int'l Crisis Group*,
  494 F.3d 1080 (D.C. Cir. 2007).........................................................................6

*Lewis v Casey*,
  518 U.S. 343 (1996)............................................................................................10

*Lujan v. Defenders of Wildlife, et al*,
  504 U.S. 555 (1992).......................................................................................8, 11

*Lujan v. National Widlife Fed'n*,
  497 U.S. 971 (1990)..............................................................................................7

*Marsh v. Or. Natural Res. Council*,
  490 U.S. 360 (1989)............................................................................................31

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)...............................................................12, 15

*Nat'l Assn. of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007)...............................................................24

*National Wildlife Fed'n v. Burford,*
    878 F.2d 422 (D.C. Cir. 1989)...............................................7

*Natural Res. Def. Council v. SEC,*
    606 F.2d 1031 (D.C. Cir. 1979).............................................32

*Natural Res. Defense Council v. Pena,*
    147 F.3d 1012 (D.C. Cir. 1998).............................................4

*\*Nevada v. DOE,*
    457 F.3d 78 (D.C. Cir. 2006).................................................18, 34

*\*North Idaho Com. Action Network v. U.S. Dep't of Transp.,*
    545 F.3d 1147 (9th Cir. 2008) ...............................................21, 22, 32

*Orion Reserves Ltd. P'ship v. Salazar,*
    553 F.3d 697 (D.C. Cir. 2009)...............................................26

*Pennaco Energy, Inc. v. Dep't of the Interior,*
    377 F.3d 1147 (10th Cir. 2004) .............................................26

*Piersall v. Winter,*
    435 F.3d 319 (D.C. Cir. 2006)...............................................16

*Powder River Basin Resource Council,* 180 IBLA 130 ..............................26, 31, 33

*Sierra Club v. Adams,*
    578 F.2d 389 (D.C. Cir. 1978)............................ 2, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14

*\*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002)...............................................9, 15

*Singleton v. Wulff,*
    428 U.S. 106 (1976)...............................................................16

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998).................................................................3

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)..............................................................8, 9

*Theodore Roosevelt Conservation P'ship v. Salazar,*
  616 F.3d 497 (D.C. Cir. 2010)............................................35

*Troy Corp. v Browner,*
  120 F.3d 277 (D.C. Cir. 1997)............................................17

**United States v. Bombardier Corp.,**
  380 F.3d 488 (D.C. Cir. 2004)........................................5, 6

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense*
  *Council,*
  435 U.S. 519 (1978)......................................................22, 31

**Whatley v. District of Columbia,**
  447 F.3d 814 (D.C. Cir. 2006)...............................................6

*WildEarth Guardians,* IBLA 2011-130, *Order* entered
  July 19, 2011 at *9..............................................................36

*WildEarth Guardians v. Salazar,*
  880 F. Supp. 2d 77 (D.D.C. 2012)................................... 4, 11, 14, 15, 16, 33, 34

## STATUTES

5 U.S.C. § 706.......................................................................34

5 U.S.C. § 706(2)(a)............................................................16

30 U.S.C. § 1202(e) ............................................................27

42 U.S.C. § 7410.................................................................36

43 U.S.C. § 1712(c)(8).........................................................35

30 U.S.C. § 184(a) ..............................................................33

Wyo. Stat. Ann. § 35-11-101 through 214 .............................36

## RULES AND REGULATIONS

40 C.F.R. § 1501.6(a)(2).......................................................30

40 C.F.R. §1508.27(b)(7)..................................................................34

40 C.F.R. § 1508.27(b)(10)........................................................33, 34

43 C.F.R. § 2920.7(b)(3)...............................................................36

Surface Mining Control and Reclamation Act .......................................27

Wyoming Surface Coal Mining Regulations, Chap. 4 § 2(d)(i)(G) ......................30

## OTHER AUTHORITIES

*Draft NEPA Guidance on Consideration of the Effects of Climate Change
    and Greenhouse Gas Emissions*" at 3, February 18, 2010, *available at*
    http://tinyurl.com/yhrexo2 ..................................................12, 13, 19

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | United States Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| $CO_2$ | Carbon dioxide |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| GHG | Greenhouse gas |
| IBLA | Interior Board of Land Appeals |
| JA | Joint Appendix |
| LBA | Lease by Application |
| NAAQS | National Ambient Air Quality Standard |
| NEPA | National Environmental Policy Act |
| NOx | Nitrogen oxides |
| OSM | Office of Surface Mining, U.S. Department of Interior |
| PRB | Powder River Basin |
| PRBRC | Powder River Basin Resource Council |
| RMP | Resource Management Plan |
| SMCRA | Surface Mining Control and Reclamation Act |
| WDEQ | Wyoming Department of Environmental Quality |
| WDEQ/ AQD | Wyoming Department of Environmental Quality, Air Quality Division |

## JURISDICTIONAL STATEMENT

Appellee-Intervenors agree with Appellees' Jurisdictional Statement.

## STATUTES AND REGULATIONS

All the applicable statutes and regulations are contained in the Appellants'

Brief.

## ISSUES PRESENTED

Appellee-Intervenors add the following two issues to Appellees' Statement

of the Issues, with which Appellee-Intervenors otherwise agree:

1.     If the Court concludes that Appellants' new standing theory has

not been waived, do Appellants have standing to challenge BLM's National

Environmental Policy Act ("NEPA") analysis of global climate change effects

simply because they have standing to challenge BLM's NEPA analysis of air

quality emissions that involve local environmental impacts?

2.     If the Court reviews the district court's dismissal of Appellants'

NEPA-based global climate change claim, did the district court properly hold that

Appellants lack standing to challenge BLM's NEPA analysis of global climate

change effects because they failed to establish a causal connection between BLM's

leasing decision and the climate change impacts they allege will adversely affect

their interests?

## STATEMENT OF FACTS

Appellee-Intervenors agree with the Appellees' Statement of Facts.

## STANDARD OF REVIEW

Appellee-Intervenors agree with the Standard of Review as set forth in Appellees' Brief.

## SUMMARY OF ARGUMENT

This Court should affirm the judgment of the district court in all respects. Appellants attempt to circumvent the district court's standing decision by arguing, for the first time on appeal, that they have standing to challenge BLM's analysis of global climate change impacts simply because they have standing to challenge BLM's NEPA analysis of other, local, impacts from leasing the West Antelope II coal tracts. Because they did not present this standing theory to the district court, Appellants have waived their right to present it for the first time in this Court. Similarly, Appellants have waived the standing theory presented to, and rejected by, the district court because they have declined to re-argue that theory on appeal.

Should the Court reach Appellants' newly-minted standing theory, that argument must fail on its merits. To the extent *Sierra Club v. Adams*, 578 F.2d 389 (D.C. Cir. 1978), remains a viable foundation upon which a party may establish standing under some set of facts, Appellants in this case cannot predicate their standing to challenge BLM's NEPA analysis of global climate change effects on their standing to challenge BLM's analysis of other purely local environmental impacts, such as air quality emissions that result directly from extracting coal from

2

the West Antelope II lease tracts.  Furthermore, should it reach the issue, the Court

should affirm the district court's holding that Appellants lack standing to challenge

BLM's global climate change analysis because they did not establish a causal

connection between the anticipated greenhouse gas ("GHG") emissions from

leasing the West Antelope II tracts and the geographically localized injuries

alleged by Appellants.  Finally, should the Court find that Appellants have

standing to challenge BLM's analysis of global climate change impacts resulting

from leasing the West Antelope II tracts, the Court should nevertheless affirm the

judgment below since BLM properly analyzed the impact of its leasing decision on

global climate change.

On the merits of Appellants' claims, BLM took the required "hard look" at

the potential impact of its leasing decision on ozone formation and reclamation of

the Antelope Mine and neighboring mines.  Finally, BLM had no obligation to

consider the impacts of its leasing decision on the federal coal acreage limit as that

statutory limit has no relevance to NEPA.

## ARGUMENT

### I.     Appellants Have Waived Any Argument That They Have Standing to Challenge BLM's NEPA Analysis of Climate Change Effects

In the district court, Appellants had the burden to establish their standing

under Article III of the Constitution.  *Steel Co. v. Citizens for a Better*

*Environment*, 523 U.S. 83, 103-104 (1998);  *FW/PBS, Inc. v. City of Dallas*, 493

U.S. 215, 231 (1990); *Natural Res. Defense Council v. Pena*, 147 F.3d 1012, 1020 (D.C. Cir. 1998). The district court held that Appellants did not do so with respect to their challenge to BLM's NEPA analysis of climate change effects because they failed to prove the necessary causal link between BLM's leasing decision and the climate change impacts they allege will adversely affect their interests.

Appellants challenge the district court's ruling on standing on only one ground, which they failed to present to the district court. Appellants argue, relying on *Sierra Club v. Adams*, that if they have standing to challenge the West Antelope II Final Environmental Impact Statement ("FEIS") on any ground, then they have standing to challenge the FEIS on all other grounds without meeting Article III's core requirements for standing. Appellants cannot rely on this new theory of standing because this argument was never raised in the district court. *See WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77, 82-87 (D.D.C. 2012). Moreover, no party cited *Adams* in their briefs in the district court. *See* JA42, 49, 97, 108, 140, 152, 157, 172, 178, and 181.

"'It is well settled that issues and legal theories not asserted at the district court level ordinarily will not be heard on appeal.'" *Earle v. District of Columbia*, 707 F.3d 299, 308 (D.C. Cir. 2012) (quoting *District of Columbia v. Air Fl., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984). Thus, "an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent exceptional

circumstances." *Flynn v. Comm. of Internal Rev. Serv.*, 269 F.3d 1064, 1068-69 (D.C. Cir. 2001) (citation and internal quotation omitted).  Exceptional circumstances are limited to "cases involving uncertainty in the law; novel, important, and recurring questions of federal law; intervening change in the law; and extraordinary situations with the potential for miscarriages of justice."  *Id.* at 1069.  The court may also consider a new issue or theory when the failure to do so would "seriously affect the fairness, integrity, or public reputation of judicial proceedings."  *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004) (citation and quotation omitted).  Of course, "[a] party's failure to pursue one of several available lines of argument is hardly 'error' of the sort that would warrant exercising [the court's] narrowly circumscribed remedial authority."  *Id.*

Here, there are no exceptional circumstances that would excuse Appellants' failure to argue their alternative theory of standing to challenge BLM's climate change analysis, and they have offered none in their brief.  *Adams* was decided in 1978, and, if Appellants intended to rely upon the approach to standing articulated therein, there is no excuse for failing to bring it to the district court's attention.  Accordingly, this Court should decline to consider this new legal argument.

Furthermore, in this Court, Appellants do not challenge the basis upon which the district court found they lacked standing, thus waiving any appeal of that

5

ruling.  Accordingly, the district court's determination on this issue is settled as

"'arguments that parties do not make on appeal are deemed to have been waived.'"

*Whatley v. District of Columbia*, 447 F.3d 814, 821 (D.C. Cir. 2006) (quoting

*Bombardier*, 380 F.3d at 497 (declining to address the district court's consideration

of a takings claim that was not raised on appeal)).  *See also American Wildlands v.*

*Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (arguments not made in

appellant's opening brief are forfeited).

The consequence of Appellants' two separate waivers is that the Court

"cannot upset the district court's dismissal" of their challenges to BLM's climate

change analysis.  *See Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1086 (D.C.

Cir. 2007) (failure in court of appeals to challenge dismissal for lack of personal

jurisdiction barred review of dismissal for lack of subject matter jurisdiction).

## II. If the Court Considers the District Court's Standing Ruling, Appellants Do Not Have Standing to Assert Climate Claims as a Result of Their Non-Climate Harms

The Appellees correctly argue (Appellees' Oppn. 23 n. 3) that Appellants'

new *Adams*-based theory of standing "is no longer viable", even if it had not been

waived.  Should the Court reach Appellants' argument, the Court should reject it,

first because *Adams* is outdated, and second because whatever viability it retains

cannot be stretched to the extent Appellants seek here.  *Adams* concluded that a

party with standing to challenge an EIS' analysis of one environmental impact may

6

assert "the interests of the general public" to challenge another, related impact. *Adams* at 392.  The Court held that a view of standing that "unnecessarily restricts" plaintiffs' ability to challenge multiple inadequacies in an EIS would be inconsistent with the purpose of NEPA, because "a reviewing court will rarely view one issue in isolation," and the integrated nature of environmental review means that issues will typically be "interrelated and interdependent." *Id.* at 393. Critically, the effect of this reasoning in *Adams* was to allow the plaintiffs to pursue the claim that there was inadequate consideration of the effect of construction of the project on persons who were *not plaintiffs and had no relation to the plaintiffs*. *Id. Adams* thus appears to stand for the expansive proposition that in the NEPA context, courts should not limit plaintiffs to challenges based on effects a project could have on them personally.

This holding of *Adams* has been cited six times in the ensuing 35 years, and only once by the D.C. Circuit in a decision reversed by the Supreme Court.  *See National Wildlife Fed'n v. Burford,* 878 F.2d 422, 431 n. 13 (D.C. Cir. 1989), *rev'd sub nom. Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990).  In the interim, the Supreme Court's standing jurisprudence has highlighted, not relaxed, the limitations of Article III.  Since *Adams*, the Supreme Court has clarified that standing must be established separately for each claim.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[O]ur standing cases confirm that a plaintiff

must demonstrate standing for each claim he seeks to press"); *Allen v. Wright*, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted"). In addition, standing to request one form of relief does not imply standing to request another. *DaimlerChrysler*, 547 U.S. at 352.

Appellants claim that *DaimlerChrysler* validated *Adams* in the course of distinguishing the scope of standing under *Adams* from the "common nucleus of operative fact" theory advanced by the plaintiffs in *DaimlerChrysler. Id.* at 353 n. 5. But this reads too much into the Supreme Court's footnote. *Adams'* reasoning was not at issue in *DaimlerChrysler,* and clearly the Court was not opining on the standing of a NEPA plaintiff to challenge the analysis of impacts that the plaintiff completely failed to show would cause him injury. Indeed, *DaimlerChrysler's* wholesale rejection of any theory of "commutative standing," *id.* at 352, indicates that *Adams*' continuing viability is quite limited.

In the NEPA context, the procedural nature of the claim diminishes the need to show redressability and immediacy, but does not ease the requirement to show injury in fact and causation, tied to actual environmental impacts on resources in which the plaintiff has an interest. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 572 n. 7 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *Ctr.*

8

*for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005). Such injury must constitute more than a purely procedural error, or deprivation of a "procedural right *in vacuo*." *Summers,* 555 U.S. at 496. As part of a demonstration that the alleged threat is "actual and imminent," and therefore inflicts an injury in fact, a plaintiff must show that an intended future use of the affected resources is in reasonable temporal proximity to the challenged action. *Id. See Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1147 (2013) ("threatened injury must be *certainly impending* to constitute injury in fact") (emphasis in original). In all respects, a plaintiff must show "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers,* 555 U.S. at 493 (quotations omitted, emphasis in original). Moreover, at the summary judgment stage the plaintiff must set forth by affidavit or other evidence specific facts demonstrating his or her standing to sue. *Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002).

While not expressly overruling *Adams*, these more recent Supreme Court interpretations of NEPA clearly mandate caution in exercising the *Adams* "public interest" justification for relaxed application of standing principles. As the Court observed in *DaimlerChrysler*, "'[t]he actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff has demonstrated harm from one particular

9

inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.'"  547 U.S. at 353, (*quoting Lewis v Casey*, 518 U.S. 343, 347 (1996)) (emphasis in original).  At most, *Adams* allows plaintiffs to challenge a NEPA analysis of alleged harms that are truly "interrelated and interdependent" with the harms for which the plaintiffs have supplied adequate evidence to satisfy Article III.  *Adams* at 393.

The question, therefore, is whether an allegation that the West Antelope II FEIS inadequately analyzes effects to *local* air quality associated with emissions of particulates, ozone precursors, and NOx from mining can reasonably be considered the same "claim," for standing purposes, as the assertion that there is inadequate discussion of the effects of the leases on *global climate* from a different pollutant. Notably, Appellants' principal climate concern is not with the mining itself, but rather the later combustion of the coal in unnamed power plants often hundreds or thousands of miles away.  *See, e.g.,* JA5 ¶¶ 40-51.  Appellants allege no effect by particulates, ozone precursors, or NOx on global climate, or of GHGs on local air quality.  *See Id.,* and ¶¶ 52-70.  The mechanism by which they allege climatological harm is the release of GHGs (primarily from the burning of coal in distant utilities), the mixing of carbon dioxide ($CO_2$) from that burning in the global atmosphere, and finally a variety of climatological changes in the area and the West generally.  Given the distinct atmospheric mechanisms, sources, and

10

effects associated with the local air quality and global climate change claims, it cannot be reasonably concluded that the alleged procedural deficiencies are "interrelated and interdependent" within the conception of *Adams,* and certainly not as standing doctrine has been refined by *Lujan v. Defenders of Wildlife.*  As a result, Appellants cannot leverage their standing to challenge the analysis of local air quality effects into a license to engage in a broad attack on the FEIS's discussion of climate and climate change.

Recent cases of this Court confirm this view.  As the district court observed, this Court has held that a petitioner claiming standing based on climate change harms must present "'evidence to suggest that [it is] adversely affected by global climate change,'" *WildEarth Guardians,* 880 F. Supp. 2d at 84 (quoting *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 148 (D.C. Cir. 2012)). *Coalition for Responsible Regulation* rejected the efforts of the State and industry petitioners to translate potential standing as to certain GHGs into standing as to others.  *Id.,* 684 F.3d at 123-24 (rejecting the argument that a petitioner's interest in $CO_2$ emissions confers standing to challenge regulation of perfluorocarbons and sulfur hexafluoride within the general rubric of GHGs).  This compels a conclusion that standing related to impacts of non-GHGs cannot be bootstrapped into standing as to GHG impacts.

11

Holding otherwise also would be inconsistent with both the science of climate change and standing jurisprudence as it relates to climate change. There can be no doubt that standing for climate change claims presents complex questions under Article III. *See Massachusetts v. EPA*, 549 U.S. 497, 541 (2007) (Roberts, J., dissenting) ("[t]he very concept of global warming seems inconsistent with [the] particularization requirement,"); *American Electric Power Co. v. Connecticut*, 131 S.Ct. 2527, 2535 (2011) (upholding appellate climate change standing determination as a result of an evenly divided Supreme Court).

This includes NEPA claims. *Center for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009) (*"CBD"*); *Amigos Bravos v. BLM*, 816 F. Supp. 2d 1118 (D.N.M. 2011). In particular, *CBD* shows the importance to the standing inquiry of the specific facts and injuries alleged, a fact also stressed in the CEQ's Draft NEPA Guidance on the Consideration of Climate Change and Greenhouse Gas Emissions. ("Guidance") (JA1279). *CBD* considered the adequacy of NEPA review of the federal offshore oil and gas leasing program, particularly in the Arctic. As explained in the Guidance, NEPA documents should take care to distinguish between the contribution of a project *to* climate change, Guidance § II, and effect of climate change *on* a project. *See* Guidance at § III (JA1284). As explained in the Guidance, a project's contributions to climate change will typically be impossible to assess in any detail, because of the long and

12

attenuated chain of causation between a specific project's emissions and effects on global climate. So too, *CBD* found the plaintiffs' "substantive" theory of standing, premised on the combustion of oil and gas extracted from offshore oil and gas wells, to be too attenuated to constitute an "injury in fact." 563 F.3d at 478-79.

Conversely, the Guidance states that "climate change effects should be considered in the analysis of projects that are designed for long-term utility and located in areas that are considered vulnerable to specific effects of climate change (such as increasing sea level or ecological change)." JA1285. The Arctic is just such an environment, and the *CBD* Court found that plaintiffs had "procedural" standing, because their use and enjoyment of arctic wildlife was threatened by claimed inadequate NEPA review of the "effects of climate change on [outer continental shelf] areas" in the context of oil and gas leasing in those areas. *Id.* at 479. Appellants make no comparable claim here – having never alleged that climate change will exacerbate the local effects of coal mining.

None of this careful analysis in *CBD* would have been necessary if plaintiffs had been able to premise their standing to challenge the climate change analysis on an entirely separate theory that oil and gas rigs scare away sea life. It would be odd if a plaintiff could establish standing under such a theory simply because that plaintiff also alleges some other localized concern as part of its NEPA challenge. Appellants' exclusive reliance on *Sierra Club v. Adams* for such a broad

13

proposition is, as shown above, untenable under the specific facts of *Adams* and in light of the Supreme Court's repeated, and more recent, adherence to the core requirements and purposes of Article III.

**III.    If the Court Considers the Issue, the District Court Correctly Determined that Appellants' Proffered Facts Do Not Establish that They Have Standing to Raise Their Climate Change Claims**

As shown above, Appellants have forfeited any challenge to the district court's ruling that they did not establish the injury in fact and causation elements of Article III standing.  If the Court were nonetheless to consider this ruling, the district court committed no error.

In evaluating Appellants' proffered evidence in support of their standing to challenge the climate change analysis in the FEIS, the district court correctly identified three defects in Plaintiffs' allegations of causation and injury.  First, the Court noted that climate change presents an inherently difficult challenge to show causation and injury, because of the diffuse nature of the problem.  *WildEarth Guardians,* 880 F.Supp.2d at 85.  Specifically, the studies offered by Appellants showed that $CO_2$ emissions "may lead to global or even broad regional climate change impacts . . . but those studies do not establish a nexus between the anticipated GHG emissions from the leasing of West Antelope II tracts and 'injuries alleged in the specific geographic area[s] of concern.'"  *Id.*  Second, whatever climatological phenomena does result, "depends on the behavior of

14

countless third parties," both as emitters and as participants in the market for energy that ultimately determines how much coal is mined and burned. *Id.* at 86.

These two causal problems are inherent to climate change, and raise significant barriers to any theory of standing premised on injuries from GHG emissions. *See Massachusetts,* 549 U.S. at 541 (Roberts, J., dissenting); *CBD,* 563 F.3d at 478-79. Very few plaintiffs may be able to establish standing, and only for limited claims. *See, e.g., American Electric Power Co.*, 131 S.Ct. at 2535. Yet *Massachusetts* also instructs that the right plaintiff, focused on certain dimensions of the problem, and supported by competent evidence, can establish standing. *See also CBD,* 563 F.3d at 478-79. And it is on the issue of evidence that Appellants ultimately and most clearly fail.

As the district court noted, any evidence in support of standing must be competent and admissible. *WildEarth Guardians,* 880 F.Supp.2d at 85; *see also Sierra Club,* 292 F.3d at 899 (D.C. Cir. 2002). Appellants' affidavits were devoid of such evidence. They consisted entirely of statements of lay witnesses citing numerous government reports and statements to the effect that climate change is an international and domestic problem, coupled with their "beliefs" and "concerns" that it would affect them. *WildEarth Guardians,* 880 F.Supp.2d at 84-85. No expert affidavits of any kind were provided. Their standing evidence thus falls well short of that required in *Massachusetts, CBD*, and *Coal. for Responsible*

15

*Regulation*.  Whatever might be the outer contours of a properly supported

assertion of standing in the climate change context, the district court did not err in

concluding that Appellants did not meet the most minimal requirements, and

dismissal of their global change claim was appropriate.

## IV.   Even If Appellants Have Standing to Challenge BLM's NEPA Analysis of Climate Change Effects, BLM Complied Fully with NEPA

Because the district court concluded Appellants lacked standing to raise their

challenge to BLM's analysis of climate change effects, the court did not address

the merits of Appellants' contentions.  880 F.Supp.2d at 87.  This Court has the

discretion, however, to consider an issue not addressed by the district court.  *See*

*Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Piersall v. Winter*, 435 F.3d 319, 325

(D.C. Cir. 2006), and may affirm the judgment below on a basis other than that

relied upon by the district court.  *See Friends of Blackwater v. Salazar*, 691 F.3d

428, 434 n.* (D.C. Cir. 2012); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49,

51 n. 2 (D.C. Cir. 1991).  The parties briefed this challenge to the FEIS in cross-

motions for summary judgment, which were based on the complete administrative

record of BLM's decisions filed in the district court.  [JA42, 49, 97, 108, 118, 140,

152, 157, 172, 178, and 181].  A court reviewing Appellants' challenge under the

Administrative Procedure Act ("APA") will apply the familiar arbitrary and

capricious standard to BLM's decision-making.  *See* 5 U.S.C. § 706(2)(a).  As this

Court has noted, in cases like this, this Court would resolve challenges brought

16

under the APA by "'review[ing] the administrative record directly.'" *Friends of Blackwater*, 691 F.3d at 432, (quoting *Troy Corp. v Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997)).  Because the district court would have no comparative advantage in conducting judicial review of Appellants' claims, and the result is clear as shown below, the Court should exercise its discretion to review these claims and reject them, and thereby avoid wasting judicial resources on a remand. *Friends of Blackwater*, 691 F.3d at 434 n.*.

In the district court, Appellants argued that BLM failed to analyze the direct, indirect, and cumulative effects of $CO_2$ emissions resulting from the mining and combustion of coal from the West Antelope II leases and other proposed leases in the Powder River Basin ("PRB"), and that BLM failed to analyze an adequate range of alternatives for addressing these impacts.  [JA53-66].  Contrary to these contentions, BLM fully satisfied its duty under NEPA by taking a hard look at these impacts and evaluating a reasonable range of alternatives.

BLM presented a thorough analysis of $CO_2$ emissions and climate change impacts, consistent with the uncertainties of climate science.  [JA645-647; JA747-757; JA920].  The FEIS first discussed the general scientific consensus on global climate change and then described the potential impacts of global climate change on river and stream flows, sea levels, soil moisture, drought, weather events and patterns, wildfires, plant and insect populations, and biodiversity.  [JA645-647;

17

JA746-751]. BLM then analyzed the relative contribution of mining coal from the West Antelope II leases to the GHG budget, by estimating the comparative percentage increase in GHG emissions over current conditions from both mining the coal and burning the coal, primarily for electric power generation. [JA645-647; JA751-756]. BLM calculated that the new leases would extend the life of the existing Antelope mine by 11 to 13 years, which would increase the contribution of direct GHG emissions by the mine to statewide GHG emissions from 0.41% to 0.63%. [JA646-647]. BLM further calculated that combustion of coal from the Antelope Mine accounted for about 1.1% of all U.S. $CO_2$ emissions for the year 2006. [JA755].

Appellants do not dispute the accuracy of BLM's estimates. Rather, they argued that additional analysis should have been presented that specified the particular climate change impacts associated with mining and combustion of coal from the leases and from the other proposed lease sales in the PRB [JA58-61]. The agency's NEPA obligations, however, are governed by the "rule of reason." *See Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 767 (2004); *Nevada v. DOE*, 457 F.3d 78, 93 (D.C. Cir. 2006). BLM's decision to present its impact analysis in terms of comparative percentages of changes in GHG emissions attributable to the approval of the West Antelope II leases clearly falls within the "rule of reason"

18

given the nature of GHGs and current scientific and technical limitations on analyzing the effects of any particular source of such emissions.

As courts reviewing challenges to NEPA analyses of climate change impacts have recognized, "greenhouse gases, once emitted, become well mixed in the atmosphere, meaning U.S. emissions can affect not only the U.S. population and environment but other regions of the world as well; likewise, emissions in other countries can affect the United States." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139 (9th Cir. 2011). Further, as BLM noted here, "[g]iven the state of the science it is not possible to associate specific actions with the specific global impacts such as potential climate effects." [JA891]. Appellants offer nothing to disturb the scientific basis for this conclusion. Accordingly, because "the effect of greenhouse gases on climate is a *global* problem; a discussion in terms of percentages is [ ] adequate for greenhouse gas effects." *Barnes,* 655 F.3d at 1139 (emphasis in original). *See also Conserv. NW v. Rey,* 674 F.Supp.2d 1232, 1253 (W.D. Wash. 2009) (disclosing project's $CO_2$ emissions as a percentage of global emissions satisfies NEPA).

This approach to analyzing climate change impacts is also consistent with the CEQ's Guidance. "[I]t is not currently useful for the NEPA analysis to attempt to link specific climatological changes, or the environmental impacts thereof, to the particular project or emissions, as such direct linkage is difficult to isolate and to

19

understand.  The estimated level of GHG emissions can serve as a reasonable proxy for assessing potential climate change impacts, and provide decision makers and the public with useful information for a reasoned choice among alternatives." [JA1281].  BLM satisfied the guidance offered by CEQ (and the *Barnes* court) by disclosing the projected GHG emissions resulting from coal mined at the existing Antelope Mine [JA755], the GHG emissions from the combustion of all PRB coal [JA751], GHG emissions from all coal-fired utilities (*Id.*), and the total U.S. GHG emissions.  *Id.*

BLM's decision not to forecast impacts beyond the relative contribution of coal leasing in the PRB is particularly appropriate given that it will be several years before these emissions are projected to commence, that they will continue over a multi-year period thereafter, and that potential future emission controls are undetermined.  *See* [JA756].  The FEIS notes that in these circumstances, "[i]t is not possible to project the level of $CO_2$ emissions that burning the coal in the West Antelope II LBA tract would produce due to uncertainties about what emission limits will be in place . . . ."  [JA756].

In the district court, Appellants relied on *Center for Biological Diversity v. NHTSA,* 538 F.3d 1172, 1216 (9th Cir. 2008), for a contrary rule, arguing that estimation of emissions in terms of percentages is insufficient.  [JA55].  *Center for Biological Diversity*, however, does not go so far, as is evident by the Ninth

20

Circuit's subsequent recognition in *Barnes* that a discussion in terms of percentages is sufficient under NEPA.  Furthermore, in this case, BLM, in contrast to the agency analysis reviewed in *Center for Biological Diversity*, did discuss the actual environmental effects of GHG emissions.  That discussion, along with the estimation of emissions in percentage terms, is surely within the "rule of reason."

Lastly, there is no merit to Appellants' contentions that BLM failed to analyze a reasonable range of alternatives.  *See Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195 (D.C. Cir. 1991).  Appellants complained that BLM did not analyze in detail two proposals briefly raised in comments after the FEIS was issued:  (a) the imposition of a mandatory carbon capture regime and (b) a requirement that the lessee must obtain carbon offsets before mining the federal coal.  [JA64-65].

This contention fails first because BLM had no obligation to consider these suggestions since they were brought to the agency's attention after the publication of the Final EIS.  *See* [JA861].  *North Idaho Com. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1155-1156 & n.2 (9th Cir. 2008) (holding that "[a]n agency is not required by NEPA to consider new *alternatives* that come to light after issuance of the EIS absent 'substantial changes in the proposed action relevant to environmental concerns,' or 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action

21

or its impacts.'") (emphasis in original) (citation omitted).  Because they failed to

suggest these alternatives during BLM's public scoping period or the public

comment period on the Draft EIS, *see* [JA324-325 and JA335-336], Appellants

have waived their right to raise them before this Court.  545 F.3d at 1155.  *See*

*Dep't of Transportation,* 541 U.S. at 764-765 (alternatives claim forfeited by

failure to identify possible alternatives in comments), (citing *Vermont Yankee*

*Nuclear Power Corp. v. Natural Res. Defense Council,* 435 U.S. 519, 553 (1978)

(plaintiffs must "structure their participation so that it is meaningful")).

Second, what Appellants call "alternatives" are really mitigation measures

that are relevant not at the leasing stage, but at later stages of development and use

of the coal.  As BLM noted in its FEIS, "BLM does not authorize mining

operations by issuing a lease" and "[a]n analysis of a detailed site-specific mining

and reclamation plan" occurs at the time a mine permit is issued.  [JA422].

Thus, the suggestions made in Appellants' fleeting FEIS comments are

really directed to mining activities and are properly considered at the mine

permitting stage.  They are not within the reasonable range of alternatives that

BLM would be required to evaluate under NEPA at the leasing stage.

## V.     BLM's Analysis of Ozone Impacts Complies with NEPA

Contrary to Appellants' contentions (Appellants' Opening Brief, "Br.", 26-

31), BLM took the requisite "hard look" at the impacts of the lease sales on ozone

concentrations.  Because any ozone impacts of mining will depend upon the

emissions of nitrogen oxides ("NOx"), the FEIS evaluated potential NOx

emissions.  [JA898; JA510-517; JA680-683].  BLM also discussed the health risks

associated with exposure to ground-level ozone, including acute respiratory

problems, decreased lung capacity, aggravated asthma, and lung tissue

inflammation.  [JA511].

     BLM further noted that the PRB, including the area of the West Antelope II

tracts, is designated an attainment area for ozone under the Clean Air Act.

[JA789].  Table 3-3 of the FEIS shows that background concentrations for ozone

for the years 2005-2007 were well within the national ambient air quality standard

("NAAQS") for ozone.  [JA496].  Although WildEarth Guardians claimed in its

comments that there have been exceedances of the ozone NAAQS in the area,

BLM showed that this assertion was not correct.  [JA932].   Even Appellants have

previously admitted that "a violation of the ozone NAAQS has yet to occur. . . ."

[JA986].  The FEIS noted that in general the regional air quality is very good and

that "[t]here have been no exceedances of the 24-hour or annual ambient air

standards resulting from mining operations at the Antelope Mine through 2005 and

none are expected from mining the LBA tract."  [JA398].  Notably, the

Environmental Protection Agency, in its comments on the draft EIS and FEIS, did

not express any concern about ozone formation in the region or about the treatment of ozone impacts in either document.  [JA831-837; JA871-872].

Appellants maintain, however, that BLM was obliged to present a more detailed analysis that evaluated potential impacts of ozone formation after mining commences (Br. 26).  Given the fact that the area is in attainment for ozone and is expected to stay in attainment, BLM's acknowledgment of the potential adverse health impacts of ozone and discussion of the formation of its precursors was sufficient.  *See Coalition for Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) ("It is of course always possible to explore a subject more deeply and to discuss it more thoroughly.  The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.").

Appellants' reliance (Br. 28) on the email comments of one of BLM's staff provides no basis for reaching a different conclusion.  *See Nat'l Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) (court reviews the final determination of the agency and allegedly inconsistent views of staff do not make that determination arbitrary and capricious.)  The BLM's analysis of the effects of leasing and mining on local ozone concentrations is well within the "rule of reason" that applies to NEPA evaluations and should be upheld by this Court.

24

## VI.   BLM's Analysis of Reclamation Impacts Complied with NEPA

Contrary to Appellants' contentions (Br. 31-51), BLM fully satisfied its obligations under NEPA to take a hard look at the impacts of coal leasing on reclamation in the PRB.  Nor have Appellants shown that BLM failed to evaluate a reasonable range of alternatives.

The record here shows that BLM exhaustively analyzed land disturbance and reclamation impacts over a full spectrum of environmental resources.  The FEIS sections concerning topography, groundwater, surface erosion, wetlands, soils, vegetation, general wildlife, mammals, raptors, migratory birds, land use and visual resources each disclose how those resources will be impacted by disturbing and reclaiming the land.  [JA479-481; JA534; JA539; JA550-551; JA554-555; JA559-561; JA566; JA573; JA575; JA582; JA587; JA602; JA616].

Moreover, the FEIS also includes land disturbance and reclamation issues within its evaluation of cumulative impacts.  *See* [JA655-658 (quantifying acreage of disturbed and reclaimed mine lands); JA667 (quantifying acreage of disturbed and reclaimed lands at oil and gas sites); JA673 (giving additional detail about disturbed and reclaimed acreage in the PRB); JA674 (topography); JA689-690 (groundwater); JA700 (surface water); JA704 (soils); JA705 (vegetation); JA709-710 (wildlife); JA714-716 (fisheries); JA720 (land use and recreation); and JA724 (cultural resources)].

Finally, BLM presented a full discussion of the projected level of coal production, land disturbance and reclamation based on two scenarios representing an upper bound case and a lower bound case, thus bracketing the range of expected impacts. [JA651-658]. Tables 4-2 and 4-3 set forth the cumulative number of disturbed acres for each scenario and provide acreage for three categories of land: (1) acreage permanently reclaimed, (2) acreage under active mining or not yet reclaimed, and (3) acreage not available for reclamation until mining operations are completed. [JA655; JA657-658].

Based on this record, the Interior Board of Land Appeals ("IBLA") concluded that the FEIS contains "lengthy discussions of the current state of mining and post-mining reclamation in the PRB" and that PRBRC had failed to show this analysis was insufficient under NEPA. *Powder River Basin Resource Council*, 180 IBLA at 130-131 [JA1139]. On judicial review, "[i]t is the IBLA's decision and not the BLM's initial action that binds the agency" and represents the final administrative decision of the Department of Interior. *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 707 (D.C. Cir. 2009). Accordingly, a reviewing court applies the deferential "arbitrary and capricious" standard of review and should "uphold the IBLA's determinations so long as the Board engaged in reasoned decision-making and its decision is adequately explained and supported by the record . . . ." *Id.* at 703-04. *See Pennaco Energy, Inc. v. Dep't of the*

26

*Interior*, 377 F.3d 1147, 1156 n. 5 (10th Cir. 2004) (deferential standard of review is applied to decision of IBLA).   In this Court, PRBRC barely acknowledges that IBLA reviewed its claims, and accordingly, fails to discharge its burden to show the IBLA's decision was arbitrary, capricious, or unsupported by the record before the IBLA.  The arguments it does present are without merit in any event.

First, the attacks on BLM's analysis of impacts on land disturbance and reclamation are based on several fundamentally false premises.  There is no evidence that the pace of reclamation is inconsistent with the requirements of any law or regulation.  Section 102(e) of the Surface Mining Control and Reclamation Act ("SMCRA") only sets *a goal* to "assure that adequate procedures are undertaken to reclaim surface areas as contemporaneously as possible with the surface coal mining operations."  30 U.S.C. § 1202(e).  As the IBLA and BLM recognized, and Appellants do not dispute, reclamation will always lag behind mining activities because of the practical realities of mining.  Generally, an area will be reclaimed only after mining in that area is complete, and certain areas, such as roads, are not available for reclamation until the entire mine closes.  [JA559].

The record fully supports BLM's conclusion that "successful post-mining reclamation has been thoroughly demonstrated" in the PRB.  [JA949].  The Office of Surface Mining Reclamation and Enforcement ("OSM") reports that the single-year statewide ratio of reclaimed to disturbed acreage across the PRB in 2008 (the

27

most recent year for which this ratio is found in the record) was 0.86. [JA1044].

The cumulative ratio of reclaimed acres to disturbed acres rose almost without

interruption from 0.075 in 1986 to 0.44 in 2008. [JA1043-1044]. Projections for

2010, 2015, and 2020 show this ratio is expected to continue improving, with the

rate of permanent reclamation projected to increase by 4% per year, compared to

the 1% expected growth in disturbance. [JA657-658; JA927]. Moreover, no

surface coal mines have experienced any bond forfeitures in Wyoming. [JA352-353].

As BLM explained, reclamation at the Antelope Mine has also been

successful. Of the 6,375 acres that had been disturbed at the mine through 2007,

about 1,500 acres were unavailable for reclamation, 3,100 acres were in active

mining operations, and the remaining 1,725 acres had been permanently reclaimed.

[JA928]. Thus, no land that was available for reclamation was left unreclaimed.

Indeed, the operators of the mine have been recognized for their reclamation

successes. In 2010, the mine received the Wyoming Department of Environmental

Quality ("WDEQ")/Land Quality Division award for "Excellence in Surface

Mining 2010" and OSM's "2010 National Award for Excellence in Surface Coal

Mining." [JA1106-1126].

Second, the IBLA reasonably rejected Appellants' reliance on Phase III

bond release statistics to support its claim that BLM had not analyzed reclamation

impacts adequately. [JA1140]. The IBLA agreed with BLM's position that "a percentage assessment of lands released from final bonding is not an accurate assessment of 'contemporaneous' reclamation . . . ." *Id.* at [JA1140]. Even OSM, upon whom Appellants rely, recognizes that final bond releases are not the only appropriate measure of reclamation success. OSM conducts an annual evaluation of Wyoming's approved regulatory program for implementing SMCRA in the state. In the report for Evaluation Year 2008, WDEQ noted that the bond release metric "severely underestimates the acres of reclaimed land on Wyoming coal mines, and results in invalid conclusions." [JA355]. WDEQ further explained that "[o]n an annual basis, many fewer acres are bond released than are reclaimed. For example, in 2007, 192.7 acres were approved for Phase III bond release, while 12,258 acres were reclaimed to final seeding." *Id.* at [JA355]. WDEQ also noted that "evaluating reclamation success using bond release is the most restrictive measure available and should be interpreted accordingly." [JA354]. OSM agreed that "Wyoming's point is valid," [JA357], and confirmed that "the number of acres released from Phase III bond is small compared to the number of acres actually regraded, topsoiled, and seeded." [JA352]. OSM stated that it was bound by a regulation to use bond release statistics in its program and explained that it also relies on an additional metric – the ratio of acres disturbed to acres seeded – to measure contemporaneous reclamation. [JA352].

29

The record also established that, for various reasons, bonds are normally released several years after reclamation occurs. For example, the final Phase III bond release cannot be granted until 10 years after reseeding. [JA357]. Rules, Dep't of Envt'l Quality Land Quality Div., Chap. 4 § 2(d)(i)(G), available at http://soswy.state.wy.us/Rules/RULES/8310.pdf (Wyoming Surface Coal Mining Regulations). Further, there is no federal or state requirement to request bond release, and companies often choose not to apply for release until large management units are eligible. [JA357; JA352]. Finally, Wyoming's coal regulatory program utilizes "area bonds" that move each year as the mine pit progresses, rather than being released after a given acre is reclaimed. [JA352].

Nor is there anything about OSM's status as a cooperating agency for the preparation of the EIS that would require BLM to premise its analysis of reclamation impacts on bond release statistics. *See* 40 C.F.R. § 1501.6(a)(2). While that regulation required BLM to "use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency," the regulation plainly reserves to BLM the discretion to investigate and evaluate reclamation activities in the PRB and to ground the FEIS on the results of its examination of actual conditions in the basin. BLM was not required to ignore the conditions on the ground and to apply a misleading criteria for reclamation success

that not even the cooperating agency had recommended to BLM for use in preparing the FEIS.

BLM's detailed analysis fully disclosed the basis for its conclusions about reclamation, and the agency's choice was well within the discretion accorded to it to make such technical judgments based on its expertise. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). On review, the IBLA concluded "that the FEIS reflects BLM's own analysis of the likely impacts of leasing and mining, including the need for and timing of reclamation," and that Appellants had not shown how that analysis was insufficient under NEPA. 180 IBLA at 131. That conclusion is adequately supported by the record and is not arbitrary, capricious, or otherwise contrary to law. Accordingly, it should be upheld by this Court.

Finally, Appellants' contention that BLM failed to consider alternatives and mitigation measures related to reclamation also fails. In this Court, Appellants challenge only the district court's ruling that these contentions had been waived by Appellants' failure to raise them at the appropriate point in the NEPA process. The IBLA also concluded, contrary to Appellants' contention (Br. at 50-51 n.10), that these concerns had not been timely raised. 180 IBLA at 136-137 n.23. The conclusions of the district court and the IBLA are manifestly correct. *See Dep't of Transportation,* 541 U.S. at 764-765; *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 553. Here, the alternatives and mitigation measure suggestions were

not raised by Appellants until after the FEIS was completed.  These suggestions came too late in the NEPA process, and Appellants therefore waived their right to have them considered on judicial review.  *See North Idaho Community Action Network,* 545 F.3d at 1155-1156 & n.2.

Appellants do not attempt to show in this Court that the alternatives or additional mitigation measures they were suggesting would have been reasonable to consider.   Any such attempt would fail, however, for various reasons.  First, the proposed alternatives to delay leasing until reclamation meets regulatory requirements, as well as the suggested lease stipulations to improve compliance, are based on the false premise that reclamation efforts are out of compliance. Second, the delay alternatives would not result in materially different impacts than alternatives analyzed in the FEIS.  *See Natural Res. Def. Council v. SEC*, 606 F.2d 1031, 1054 (D.C. Cir. 1979) (concluding that an agency may decline to consider alternatives that are substantially similar to alternatives the agency has already considered).   BLM's analysis of alternatives and mitigation measures are well within the "rule of reason" applicable to NEPA analysis.  *See Citizens Against Burlington,* 938 F.2d at 195, 205-206 (NEPA requires only consideration of reasonable alternatives and "a reasonably complete discussion of possible mitigation measures. . . .").  Although the IBLA found Appellants' suggestions for alternatives and mitigation were raised too late in the NEPA process, the IBLA

32

also rejected Appellants' contention that BLM had violated NEPA by failing to consider them.  180 IBLA at 136-138.  That conclusion is fully supported by the record and not arbitrary or capricious, and therefore should be upheld by this Court.

## VII.  There is No Merit to the Claim that BLM Failed to Ensure Compliance with the Acreage Limitations of the Mineral Leasing Act

The district court correctly rejected Appellants' claim that BLM was required to analyze in the FEIS whether expansion of the Antelope mine would lead to a violation of the acreage limitations of the Mineral Leasing Act, 30 U.S.C. § 184(a).  Appellants rely on a NEPA regulation (40 C.F.R. § 1508.27(b)(10)), which requires agencies to examine "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."

The district court rejected this argument because it concluded that the acreage limitation was an economic regulatory requirement and not imposed for the protection of the environment.  *See* 880 F. Supp.2d at 93-94.  Appellants have never contended otherwise, and therefore have conceded this point.  Their only argument is that the Court misconstrued the regulation, contending that the phrase "imposed for protection of the environment" modifies only the term "requirements" and not the terms "Federal, state or local law" because the latter two groups of terms are separated by the disjunctive "or."  The use of the

disjunctive serves to distinguish between "law" and "requirements," and does not

prevent the phrase "imposed for the protection of the environment" from being

applicable to all the preceding terms.  Notably, § 1508.27(b)(10) is the last of

several factors responsible officials should "bear in mind" in assessing the

"intensity," which is the "severity of impact" of the proposed action.  Throughout

this section, "impact" in this context plainly means "impact to the *environment*."

*See, e.g.,* 40 C.F.R. §1508.27(b)(7).  The district court thus correctly concluded,

given that the purpose of NEPA and its implementing regulations is to ensure

consideration of the environmental consequences of agency action, it would be

unreasonable to construe the regulation to require evaluation of compliance with

laws or requirements that have no relationship to protecting the environment.  880

F.Supp.2d at 93.

      In any event, Appellants have never attempted to challenge the IBLA's

conclusion, based on the uncontradicted evidence before the IBLA, that no

violation of the acreage limitation would occur.  [JA1135].  Under these

circumstances, Appellants have not met their burden under 5 U.S.C. § 706 to show

that even if BLM should have analyzed the acreage limitation in the FEIS, that

such an error was prejudicial.  *See Nevada v. DOE*, 457 F.3d 78, 90 (D.C. Cir.

2009) (finding alleged noncompliance with NEPA did not constitute prejudicial

error).  Where the putative error does not affect the outcome, there would be no

point in ordering BLM to undertake the formality of supplementing the EIS.  *Id.*

## VIII.  BLM Fully Complied with FLPMA

Appellants contend that under the Federal Land Policy and Management Act

("FLPMA"), BLM has an obligation to analyze and ensure compliance with

substantive air quality standards as if BLM was the primary regulator of air

quality.  (Br. 56-59).  FLPMA imposes no such obligation.  Instead, FLPMA

simply requires the BLM to condition leases on compliance by the lessee with

applicable federal and state pollution control laws, and FLPMA allows those other

federal and state agencies to permit, monitor, and enforce those substantive

standards.

Under FLPMA, the BLM "uses a multi-step planning and decision-making

process[.]"  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504

(D.C. Cir. 2010).  "The [BLM] begins by creating a land use plan for a geographic

region.  This plan is called a resource management plan (RMP)."  *Id.*  FLPMA

provides that in the development and revision of land use plans, the Secretary shall

"*provide for* compliance with applicable pollution control laws, including State and

Federal air, water, noise, or other pollution standards or implementation plans."

43 U.S.C. § 1712(c)(8) (emphasis added).  Similarly, the BLM's regulations

provide that land use authorizations shall contain terms and conditions which shall

"*[r]equire compliance* with air and water quality standards established pursuant to applicable Federal or State law[.]"  43 C.F.R. § 2920.7(b)(3) (emphasis added).

BLM provides for compliance with applicable pollution control laws by requiring lessees of the public lands and minerals to obtain the necessary permits from the appropriate regulatory agency.  [JA776] (listing additional agencies requiring permits).  Within the borders of the State of Wyoming, the WDEQ Air Quality Division ("WDEQ/AQD") is vested with primary regulatory authority over air quality, not the BLM.  *See* 42 U.S.C. § 7410; Wyo. Stat. Ann. § 35-11-101 through 214. As BLM explained:

> Air Pollution is controlled by state and federal air quality regulations and standards established under the federal Clean Air Act Amendments.  State implementation plans are in place to ensure that proposed actions like coal mining comply with all associated air quality regulations and criteria.  The Wyoming Ambient Air Quality Standards for the $PM_{10}$ annual and the SOx annual and 24-hour levels are more stringent than the National Ambient Air Quality Standards and are enforced by the WDEQ-Air Quality Division.
>
> Large surface coal mines have the potential to become particulate emission sources in the PRB contributing to air quality degradation.  By statute, WDEQ-AQD has the authority and responsibility to require mitigation for air quality impacts.  BLM does not have the authority to mitigate air quality impacts.

BLM's Response to Public Comments at 11.  *See also e.g., WildEarth Guardians*, IBLA 2011-130, *Order* entered July 19, 2011 at *9 (holding that the BLM may

properly rely on the WDEQ/AQD with oversight by the Environmental Protection Agency to ensure that coal mining in the PRB does not exceed or violate any State or Federal air quality standard).

FLPMA does not authorize or require the BLM to supplant the WDEQ/AQD as the substantive regulator of air quality in Wyoming. Moreover, as a practical matter, BLM is in no position to take on this role, as to do so it would be required to hire the equivalent of the entire WDEQ/AQD to conduct the permitting, monitoring, and enforcement activities that would be necessary for meaningful substantive air quality regulation on the public lands in Wyoming.

In this case, both the applicable RMPs explicitly provide for compliance with all applicable pollution control laws, and the BLM specifically determined that leasing the West Antelope II tracts was compatible with the RMPs. [JA427; JA230]. Moreover, any lease executed pursuant to the decision on the West Antelope II tracts will contain a provision requiring the lessee to comply with the Clean Air Act, the Clean Water Act, and SMCRA. [JA784]. BLM has therefore fulfilled its obligations under FLPMA to *provide for* compliance, and the WDEQ, as the primary regulator and enforcement agency, will *ensure* compliance with state and federal air quality standards. Accordingly, the district court's determination that the decision to lease these tracts complied with FLPMA should be affirmed.

37

## CONCLUSION

The judgment of the district court should be affirmed.

August 26, 2013.

Respectfully submitted,

/s/ Andrew C. Emrich
Andrew C. Emrich, P.C.
Holland & Hart LLP
6380 S. Fiddlers Green Circle, Suite 500
Greenwood Village, CO 80111
(303) 290-1621 - phone
(800) 711-8046 - facsimile
acemrich@hollandhart.com

John A. Bryson
Holland & Hart LLP
975 F Street, N.W., Suite 900
Washington, DC 20004
(202) 654-6920 – phone
(202) 747-6568 – facsimile
jbryson@hollandhart.com

ATTORNEYS FOR APPELLEE-
INTERVENOR
ANTELOPE COAL LLC

/s/ James Kaste
James Kaste
Senior Assistant Attorney General
Wyoming Attorney General's Office
123 State Capitol
Cheyenne, WY 82002
(307) 777-6946 – phone
(307) 777-3542 – facsimile
james.kaste@wyo.gov

ATTORNEY FOR APPELLEE-
INTERVENOR
STATE OF WYOMING

/s/ Creighton R. Magid
Creighton R. Magid
Dorsey & Whitney LLP
1801 K Street, N.W., Suite 750
Washington, D.C. 20006
(202) 442-3000 – phone
(202) 442-3199 – facsimile
magid.chip@dorsey.com

ATTORNEY FOR APPELLEE-
INTERVENOR
NATIONAL MINING ASSOCIATION

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Fed. R. App. P., the undersigned hereby certifies that the foregoing Response Brief of Intervenor-Defendant-Appellees has 8688 words, exclusive of front matter and certificates, in compliance with this Court's order dated January 24, 2013, providing that the joint brief for the non-Federal appellees shall not exceed 8,654 words.  This brief is proportionally-spaced, 14-point Times New Roman font.

/s/ Andrew C. Emrich

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of August, 2013, I caused to be electronically filed the foregoing Initial Brief for Intervenor-Defendant-Appellees with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the Court's CM/ECF system.  All registered CM/ECF users will be served by the Court's CM/ECF system.

/s/ Andrew C. Emrich

6209867_9

41